O’Neall, J.
dissenting. In this case, having the unpleasant duty to perform of differing from all my brethren, it is, I think, necessary to shew, that I do not do so for slight and trivial causes. The result of this case is to disseize the defendant of his freehold by the mere naked judgment of the Ordinary on a question of adverse title ! Such a result has never been before attained in the progressions which justice has from age to age made.
Before entering upon the question mainly to he discussed, I propose to free the case from the supposition, that it is concluded by the case of Gates vs. Irick, (2 Rich. 593).
It is very true, the ingenious and elaborate views of the Judge delivering the opinion (Wardlaw, J.) would conclude this question. But, really and truly, his observations on this matter were wholly outside of the case. The decision of the Court *114 was, to send the case back, and give the party leave to amend if necessary : or if the Ordinary had only ordered the sale of a part, when he ought to have ordered a sale of the whole, then, that his decree should be set aside. That case, therefore, presents no other obstacle, than the very respectable authority of a single Judge.
It was supposed by the counsel, that he was justified in saying that the ruling below, that the decision by the Ordinary had only the prima facie effect of giving to the plaintiff title under it until the defendant shewed a title in himself, was extraordinary, and, perhaps, absurd. I do not find fault with any form of expression which a lawyer chooses to use in arraigning one of my opinions. But I undertake to shew that the ruling was right. Until the defendant’s defence was disclosed, how was the Court to know that the decree was not made in a case where a common right, arising from the intestacy of the deceased, was acknowledged ? How could the case then be otherwise considered than that the plaintiff had prima facie made out the title ? When the defendant alleged he was in by an adverse title, and not as parcener, his allegation could not destroy the judgment of the Ordinary’s court. He had to prove that fact, and when he did, (as the verdict shews he did) I affirm, and hope to prove, that the Ordinary’s decree was void, being pronounced on a matter of which he had no jurisdiction.
There is no doubt that the Ordinary may, under the Acts of 1824 and 1839, make partition of land, under the value of $1000, of which an intestate died seized, among his heirs at law, by actual partition or sale. But when there is a question of adverse title set up, and he finds it not a pretence, he is bound by the constitution of South Carolina to hold his hand and leave it to be settled, where it can alone be, in a Court of Law.
The 2d sec. of the 9th Art. of the Constitution provides that “ no freeman of this State shall be taken, or imprisoned, or dis-seized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the *115 law of the land,” This clause of the Constitution, as well as the 6th sec. of the same article, secures jury trial in all the cases mentioned, save where “the law of the land” might justify some other proceeding. What is meant by the law of the land ? The counsel for the plaintiff alleged that any Act of the Legislature was “law of the land,” within the meaning of those words used in the Constitution. If that be so, poor indeed is the guaranty of a paramount law binding upon the Legislature, as well as the people. But I deny, — most solemnly and fervently do I deny, — that any such meaning can be rightfully ascribed to the words used.
In Zylstra’s case, decided in ’94, (1 Bay, 382,) the lawyers and Judges, who were fresh from the floor of the Convention which framed the Constitution, did not pretend to give the words any such meaning. Judge Waties, who may well be said to have been the Mansfield of South Carolina, quotes the language of Lord Coke in defining those words in Magna Charta, and says, what I think may still be affirmed, that no English lawyer has ever questioned its correctness. The words, “ the law of the land,” mean the common law, or Acts of Parliament down to the time of Edw. II, which are considered as part of the common law, which doth not in all cases require a trial by jury.” To this must be added, what was said by another of the great lights of jurisprudence, my late brother Earle, in the State vs. Coleman, (1 McM. 501-2). Speaking of Lord Coke’s definition above cited, he says, “ by analogy, it has been held in this State, that the same terms used in our Constitution, must embrace the common law as then adopted here, and the Statutes of Great Britain, and of this State, made of force, and in operation at that time.” The words “ law of the land,” used in the Constitution, have no meaning beyond what is given in the citations which I have made from Zylstra’s and Coleman’s cases. I have referred to the meaning of the words in the Constitution more for the purpose of putting my foot on such a construction as would make them worthless and unmeaning, than any thing else. For the 6th sec. of the 9th article is that which, *116 in my judgment, decides the whole matter here in controversy. Its words áre, “ The trial by jury, as heretofore used in this State, and the liberty of the Press, shall be forever inviolably preserved.”
Here, let it be asked, did any forum exist, at the era of the Constitution, where titles to land were settled without a jury ? None such can be found. The Act of ’69, which, by its 6th sec. clothed the Court with the summary jurisdiction, gives it with the significant words “ except when the title of lands may come in question.” Thus shewing that a Judge, sitting with a jury by his side to whom he could refer it, should not, even then, have cognizance of a question of title to land.
The Court of Equity, proceeding as it does, without a jury, has never ventured to touch a naked question of adverse right to land. I say so from a long and intimate acquaintance with its practice before 1828 — and from the benefit of six years administration of its rules and principles in the Court of last resort. Few, perhaps no, cases deciding the very point, can be found. For the principle is considered so definitively settled, that it has never been challenged by appeal. Indeed, I trust I may be pardoned for saying that I think it is sometimes carried too far by our brethren, the Chancellors. For I sometimes am called on to try a question of adverse right to land on an issue from Chancery, where a very slight examination would have shewn that it was a mere pretence.
In the case of Ramsay & wife vs. Deas. (2 Des. 239), decided in the year 1804, is a precedent of an issue ordered by the Court as a matter of course, where a title by adverse possession was set up. In Bowman & wife vs. Middleton, (1 Des. 159,) decided in 1789, an issue was ordered to try the title to land sold, under an order of the Court, before the purchaser would be compelled to accept a title. In Wilkin vs. Wilkin, (1 Johns. Ch. 111,) Chancellor Kent says, “the court (Chancery) does not sustain a bill for partition, unless the title be clear.”
These precedents are enough for my purpose, and they shew *117 how tenderly the Court of Equity touches a question of adverse title.
I presume it would not meet with the slightest encouragement from any lawyer, that the Ordinary could exercise jurisdiction, or his decree have any effect whatever, on a question of title of land, were it not for the appeal given to the Court of Law, and the direction contained in the Act of ’39, that “such issue in law or fact, shall be made up as may be necessaiy or proper, and shall be tried according to the usage and practice of the said court.” (11 Stat. 42 — 13th sec. of the Act of ’39).
If there be a principle, in the whole body of the law, which declares that an appeal from a court not having jurisdiction of a case to one which could originally hold jurisdiction of it, will rightfully confer jurisdiction on the court otherwise not having it, I confess I have it yet to learn.
In White vs. Kendrick, (1 Brev. 469,) the question was, whether the Act of the Legislature conferring jurisdiction on a magistrate as high as $30, was constitutional. The Court held, that inasmuch as the jurisdiction of a Justice of the Peace at the adoption of the Constitution did not exceed £20 currency, equal to £5 sterling, which is equal to $21 43, that this was the limit of his jurisdiction ; and that the trial by jury, as heretofore used, was invaded by giving cognizance to a Justice of the Peace above that sum. The Judges there did not at all notice the appeal which could have been taken to the Court of Common Pleas. So far, therefore, I think, as precedent is concerned, this case is decidedly against the new reading of the Constitution which is attempted in clothing the Ordinary with jurisdiction by appeal. If an appeal might give jurisdiction, how can that effect be produced on a party who does not appeal, and who, by his silence, places himself on his constitutional rights ?
That the Otdinary possesses a very limited jurisdiction is apparent: originally, he had nothing to do with land : the Act of 1824 gave him jurisdiction for partition of an intestate’s real estate, not exceeding $1000. He never has had a jury, nor the right to hold cognizance of a case settling adverse rights to *118 property, real or personal. When he decides a question of title to land, is not that a direct infringement of the constitutional right which is guaranteed to every citizen of the State, by the words of the Constitution “ the trial by jury, as heretofore used, shall forever be inviolably preserved ?” At the adoption of the Constitution, no Ordinary, nor even the superior jurisdiction of Equity, had undertaken to pass on the question of title to land. It had, until then, and indeed until very recently, been supposed that no court, save the Common Pleas, could pass upon it.
In this case, the effect of the Ordinary’s decree is to divest the defendant of a title to land of which he is in possession, and which has been supported by the verdict of a jury approved by the Judge trying the cause. Can it be possible, that such an unjust result, so directly in the face of the Constitution, is to have the high sanction of the Law Court of Appeals 1

Motion granted.